[No. A040139. First Dist., Div. Three. Feb. 23, 1990.]

JAMES DONALD, Plaintiff and Appellant, v.
CAFE ROYALE, INC., Defendant and Respondent.

## COUNSEL

Paul L. Rein and Bryce C. Anderson for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Kathleen W. Mikkelson, Deputy Attorneys General, Louise Renne, City Attorney (San Francisco), Elaine Warren, Deputy City Attorney, Arlo Smith, District Attorney (San Francisco), and Robert H. Perez, Assistant District Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

Michael S. Pecherer for Defendant and Respondent.

## OPINION

**MERRILL, J.**—The long-standing policy of our state has been to permit our physically disabled persons the "same right as the able-bodied to the full and free use of the streets, highways, sidewalks, walkways, public buildings, public facilities, and other public places." (Civ. Code, § 54.)[1] Within the statutory scheme for enforcement of this right to equal access, our state Legislature has enacted statutes authorizing individuals to bring private actions for damages and injunctive relief against noncomplying entities. (See §§ 54.3, 55.) James Donald, a quadriplegic confined to a wheelchair, brought such an action against respondent Cafe Royale, Inc. (Cafe Royale), on the grounds that the San Francisco restaurant operated by this corporation had not complied with the pertinent access statutes and had denied him equal access. The trial court entered judgment for Cafe Royale on the basis that even if there was a lack of compliance with these access statutes, it was not established that the violation was "willful and intentional." Injunctive relief was denied for the reason that during the course of this litigation Cafe Royale became insolvent and was no longer in business. Cafe Royale was awarded attorney fees and costs as the prevailing party on the cause of action for injunctive relief. Donald appeals.

[1] All further statutory references to section 54 et seq. are to the Civil Code.

FACTS

I

In his lift-equipped van, on December 11, 1984, Donald drove from Sacramento and picked up his companion, Marivic Mabanag, at San Francisco's City Hall. Donald, an attorney, is a former deputy attorney general and former member of the Attorney General's task force on disability and former deputy director of the State Department of Rehabilitation. At the time of trial Donald was the United States representative to Disabled Peoples International and the chairman of its Human Rights Committee. Donald was acquainted with Mabanag because of her position with the mayor's office concerning agency funding for compliance with handicap access laws.

After meeting Mabanag, Donald drove to the Cafe Royale restaurant. While there was conflicting testimony as to their purpose in going to the restaurant, the trial court found they intended to inspect the premises for accessibility.

There is no dispute in the record that the Cafe Royale had been constructed on three levels. The entry level contained the bar, the piano, raised stools at raised tables and four or five nonraised tables. The main dining area was located on 2 raised tiers, the first level being 18 inches above the entry level and the second level being 18 inches above the first. These two tiers were accessible only by stairs.

The evidence showed that the only dining area with seats accessible to persons confined to wheelchairs was an area adjacent to the bar. This area was designed to hold six tables, seating a total of twenty-six people. The total capacity of the restaurant was 100 dining seats and 35 bar stools. On the evening Donald and Mabanag went to the restaurant four, and possibly five, nonraised tables were wheelchair-accessible in the area adjacent to the bar. The assistant manager, Cap Lingo, testified these tables were not generally used for dining, unless a patron requested to sit in this area. Raymond Bohm, the general manager, testified that the few tables which were handicapped-accessible were sometimes used on the weekends as an "overflow" area from the main dining area or as a dining area for patrons who specifically requested it. Otherwise, the raised tiers constituted the dining area for nonhandicapped persons and the lower level was the dining area for handicapped persons.

The trial court found that, upon entering the restaurant, Donald asked Lingo what would happen if they wanted to dine there that evening. Lingo replied that they could be accommodated. He was referring to the four or

five nonraised tables in the lounge area, next to the piano. Mabanag testified that she did not observe anyone dining in this area of the restaurant and that it appeared to her to be the bar. Donald asked how a group of persons confined to wheelchairs could be accommodated and Lingo replied that if he made a reservation the group could be accommodated. When Donald asked if the tables on the raised tiers were the only tables for dining, another Cafe Royale employee replied that they were but that it would be no problem as Donald could be lifted up the stairs. Donald testified that he declined the offer to be lifted because of the danger he might be dropped and because of the attention he would attract. Donald and Mabanag made a further inspection as to wheelchair accessibility of the restrooms and telephone, and then departed without dining.

Malcolm Morrison, the architect for the Cafe Royale, stated that he merely used the designs created by the corporate president, Sam DuVall, in obtaining the building permits. Although Morrison was aware generally of handicap access requirements, he wanted to know how San Francisco's building department was interpreting the relevant statutes and codes so he consulted with an employee of that department. Morrison testified that in an "over the counter" discussion with an unidentified employee of the building department, he was informed that 25 percent handicap seating accessibility was all that was needed for compliance.

In fact, Government Code section 4450 et seq.[2] requires that facilities conform to building standards published in the State Building Standards Code relating to access for the physically handicapped. The code provides that all floors of a restaurant be on a common level or connected by ramps or elevators. Under a hardship exception, the code will permit a configuration whereby only 75 percent of the dining area need be handicap accessible. (Cal. Code Regs.,[3] tit. 24, § 2-522, subd. (e).) It was undisputed, however, that Cafe Royale had never made a hardship request and, in any event, had far less than 75 percent accessibility.

All parties agreed that Cafe Royale's seating capacity was in violation of the handicap access requirements. In closing argument, counsel for Cafe Royale stated: "[W]e have never questioned that the restaurant was out of compliance. We have never questioned that at all. The position of the defense has been that we believed in good faith that it was in compliance."

---

[2] All further statutory references to section 4450 et seq. are to the Government Code.
[3] Prior to January 1, 1988, the California Code of Regulations was known as the California Administrative Code. (See Gov. Code, § 11344.)

## PROCEDURAL BACKGROUND

## II

Donald's complaint contains three causes of action. The first alleges the construction, alteration and maintenance of facilities by Cafe Royale in violation of Health and Safety Code section 19955 et seq.[4] and Cafe Royale's failure to correct these unauthorized deviations within 90 days of receiving notice from Donald pursuant to Government Code section 4452; the second claims Donald was denied equal access to the facilities in violation of section 54 et seq.; and the third seeks injunctive relief under section 55.

A court trial was conducted and judgment was entered against Donald on all three causes of action. In its statement of decision, the trial court found that after being informed by Donald of its noncompliance, Cafe Royale consulted in good faith with the San Francisco Building Department to determine whether or not the accessibility requirements had been met. The building department concluded that the premises failed to comply with the accessibility requirements and discussed compliance with Cafe Royale by the means of ramps, lifts, and reconstruction. The trial court agreed with the position of Cafe Royale that in order to bring the restaurant into compliance, seating would be reduced and the restaurant would not be able to operate profitably. In November 1985, after Donald filed his complaint and Cafe Royale answered, the building department informed Cafe Royale that failure to take steps voluntarily to correct the violations would result in abatement proceedings. Cafe Royale became insolvent, surrendered its lease and stopped operation by January 31, 1986. The court found that Cafe Royale's decision to go out of business rather than to proceed with efforts to bring the restaurant into compliance was a reasonable business decision.

The trial court determined Donald failed to prove actual damages in respect to any cause of action. As to the second cause of action the court ruled that the denial or interference with admittance to or enjoyment of the facilities pursuant to section 54.3 must be intentional and willful, and that this was not established by the evidence. The court found that during the remodeling of the restaurant, Cafe Royale maintained an honest and good faith belief that the premises were in compliance.

As to the injunction cause of action, the court determined "it would be an idle act to invoke such a remedy against [a] defendant that is insolvent, no longer in business and dissolved as a corporation."

---

[4] All further statutory references to section 19955 et seq. are to the Health and Safety Code.

DISCUSSION

III

■ By his second cause of action, under section 54 et seq., Donald asserted he was damaged by Cafe Royale's denial of equal access. He sought actual and punitive damages as well as attorney fees. The trial court denied recovery on this claim despite its finding of Cafe Royale's noncompliance with the access requirements, i.e., section 19955 et seq., section 4450 et seq. and related State Building Standards Code provisions. The court interpreted section 54.3 as requiring an intentional and willful violation before recovery may be had.

Section 54 declares, in part, the physically disabled are entitled to the same right as the able-bodied to the full and free use of, inter alia, public buildings, public facilities, and other public places. Section 54.1 declares that physically disabled persons "shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, and privileges of all . . . places of public accommodation, amusement or resort, and other places to which the general public is invited . . . ."

Pursuant to section 54.3: "Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 or otherwise interferes with the rights of a . . . physically disabled person under Sections 54, 54.1 and 54.2 is liable for each such offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than two hundred fifty dollars ($250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54, 54.1, and 54.2."

Notwithstanding Cafe Royale's noncompliance with the pertinent handicap access statutes, the trial court determined Donald was not entitled to recovery under section 54.3 as Cafe Royale had not intentionally or willfully denied him access. We have determined the referenced statutes do not require an intentional violation for recovery to be had.

Our analysis begins with the construction of the various statutes in question. In this analysis, we take into consideration the well-established canons of statutory construction.

■ Our primary task is to ascertain the Legislature's intent so as to effectuate the purpose of the law. (See *People* ex rel. *Deukmejian* v. *CHE,*

*Inc.* (1983) 150 Cal.App.3d 123, 132 [197 Cal.Rptr. 484], and cases there cited.) Toward this end we must accord a reasonable and commonsense interpretation consistent with the Legislature's purpose. (*Ibid.*)

Legislative intent may only be determined by reference to the context in which the words are used. A court must discern the purpose of the statute by examining the entire enactment. (*Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 613 [200 Cal.Rptr. 575].) "[A] statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts [citations] . . . ." (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50, 54 [191 Cal.Rptr. 537].) This is a restatement of the rule that statutes in pari materia, i.e., concerning the same subject matter, are a relevant source of aid in interpreting the statute in question. (*People* v. *Chevron Chemical Co., supra,* at p. 54.)

Another critical concern in analyzing the language of the statute is " 'the objective sought to be achieved by a statute as well as the evil to be prevented. . . .' [Citation.]" (*People* ex rel. *S. F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790]; *Leslie Salt Co.* v. *San Francisco Bay Conservation etc. Com., supra,* 153 Cal.App.3d at p. 614.)

■ Finally, the legislative history of a statute is a legitimate and valuable aid to ascertaining the statutory purpose. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

■ Viewing the statute reasonably and in a commonsense fashion compels the conclusion that no intent element is set forth. Under section 54.3, a physically disabled individual who has been denied equal access to public facilities, as prohibited by sections 54, 54.1, and 54.2, may recover treble damages "but in no case less than" $250. The plain meaning of this language is that ordinarily minimum statutory damages in the amount of $250 must be awarded for a denial of equal access in violation of section 54 et seq., notwithstanding the defendant's intent.

This interpretation is in accord with and furthers the apparent statutory purpose. The various legislative pronouncements of our state's policy leave no doubt that the purpose of section 54 et seq. and section 19955 et seq. is to reduce or eliminate the physical impediments to participation in community life by the physically handicapped. (*In re Marriage of Carney* (1979) 24

Cal.3d 725, 738 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028].) The express purpose of section 19955 and section 4450 is to make all public and private buildings accessible to physically handicapped persons. In further-ance of this goal, section 19955, which incorporates section 4450 by refer-ence, establishes specific standards of compliance in the State Building Standards Code. Section 19955 provides in part: "(a) The purpose of this part is to insure that public accommodations or facilities constructed in this state with private funds adhere to the provisions of Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code." This statute specifically includes restaurants within the definition of public ac-commodations or facilities. In turn, section 4450 of the Government Code mandates the State Architect's adoption of building standards and other regulations "for making buildings, structures, sidewalks, curbs, and related facilities accessible to and usable by the physically handicapped."

The purpose of this legislation is further echoed in administrative regula-tions. Pursuant to section 4450, the State Building Code[5] requires: "In buildings and facilities, floors of a given story shall be a common level throughout, or shall be connected by pedestrian ramps, passenger elevators, or special access lifts."[6] (Cal. Code Regs., tit. 24, § 2-522, subd. (e).) The purpose of this part is: "To assure that barrier free design is incorporated in all buildings, facilities . . . to which this Code applies to assure that they are accessible to, and usable by, physically handicapped persons." (Cal. Code Regs., tit. 24, § 2-101, subd. (b).)

The legislative concern with the enforcement difficulties of the handicap access legislation has been stated with clarity. In declaring an amendment to section 54.3 to be an urgency statute, the Legislature explained: "This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution

---

[5] The State Building Code is a part of the compiled State Building Standards Code. (Cal. Code Regs., tit. 24, § 2-100.)

[6] This section also contains the following four exceptions which, as shown by the evidence, were not pertinent to the instant action: "EXCEPTION NO. 1: In existing buildings, other than dining, banquet, and bar facilities, when the enforcing agency determines that compliance with this section would create an unreasonable hardship, an exception shall be granted when equivalent facilitation is provided. [¶] EXCEPTION NO. 2: In new and existing dining, ban-quet, and bar facilities, when the enforcing agency determines that compliance with this sec-tion would create an unreasonable hardship, an exception shall be granted provided that a minimum of 75 percent of the dining, banquet, and bar area shall be a common level through-out or shall be connected by pedestrian ramps, passenger elevators, or special lifts. See Sec-tion 2-110(b)11D for new buildings only. [¶] EXCEPTION NO. 3: In existing buildings, this section shall not apply when legal or physical constraints would not allow compliance with this section or equivalent facilitation without creating an unreasonable hardship. See Section 2-110(b)11D. [¶] EXCEPTION NO. 4: Where specifically exempted in other portions of this code."

and shall go into immediate effect. The facts constituting such necessity are: [¶] Many physically disabled persons are presently being deprived of their civil rights because *the enforcement provisions of Sections 54, 54.1, and 54.2 of the Civil Code are not adequate to insure such rights.* This act will provide adequate enforcement and insure that the civil rights of physically disabled persons are being enforced and thus it is necessary that this act take effect at the earliest possible date." (Stats. 1977, ch. 881, § 4, p. 2651, italics added.)

The Legislature's awareness of the continuous problems of enforcement is also reflected in the expansive nature of this body of legislation. (See Achtenberg, *"Crips" Unite to Enforce Symbolic Laws: Legal Aid for the Disabled: An Overview* (1975) 4 U. San Fernando Val.L.Rev. 161, 175, 208.) Over the two decades since the enactment of sections 54, 54.1 and 54.3, the Legislature has repeatedly expanded the methods of enforcement. (See *People* ex rel. *Deukmejian* v. *CHE, Inc., supra,* 150 Cal.App.3d at p. 135, quoting *In re Marriage of Carney, supra,* 24 Cal.3d at p. 740.) As originally enacted in 1968, section 54.3 set forth that a denial of equal access under sections 54, 54.1 and 54.2 constituted a misdemeanor. (Stats. 1968, ch. 461, § 1, p. 1093.) In 1976, the statute was amended so that anyone depriving a physically handicapped person of equal access was subject to liability for actual damages plus a maximum of $500 in punitive damages for each offense. (Stats. 1976, ch. 971, § 2, p. 2270.) In 1977, the limit on punitive damages was increased to $1,000. (Stats. 1977, ch. 881, § 1, pp. 2650-2651.) The 1981 amendment removed the $1,000 cap on punitive damages and set forth, as the statute now provides, that a violator is liable for actual damages as well as an amount up to three times actual damages "but in no case less than two hundred fifty dollars ($250) . . . ." This last amendment also subjected a defendant to liability for the plaintiff's attorney fees. (Stats. 1981, ch. 395, § 1, pp. 1582-1583.)

An additional remedy was added by the enactment of section 55 in 1974. By this statute, a private action for injunction was authorized for any individual aggrieved or potentially aggrieved by a violation of section 54 or 54.1. (Stats. 1974, ch. 1443, § 1, p. 3150.)

Finally, in 1976 the Legislature endorsed an additional enforcement method by enacting section 55.1 which authorizes injunction actions by the district attorney, city attorney, Department of Rehabilitation or Attorney General. (Stats. 1976, ch. 869, § 1, p. 1979.)

It is plain to see the Legislature's purpose in imposing increased penalties and additional enforcement methods is to guarantee compliance with equal access requirements. The impediments to the physically handicappeds' interaction in community life is the inequity which section 54 et seq. and

section 19955 et seq. seek to prevent. This goal is not met by adopting an interpretation of section 54.3 which would include an element of intentional violation. Such a construction ignores the express language of the statute, its apparent purpose, and the public policy goal of the legislation. The level of compliance would diminish, a result that is clearly repugnant to the statutory purpose.

In *Drewry* v. *Welch* (1965) 236 Cal.App.2d 159 [46 Cal.Rptr. 65], in analyzing the validity of Civil Code section 3346 pertaining to double damages for trespass in removing timber, the court held the penal aspect of the statute did not invalidate it. The court considered the numerous areas in which the Legislature has enacted penal statutes without reference to any element of willfulness or malice. (*Id.*, at pp. 173-174.) The *Drewry* court reasoned: " '. . . "Public policy may require the Legislature, in prohibiting and punishing particular acts under certain circumstances, to provide expressly or impliedly, that any person who shall do the act shall do it at his peril, and that he shall not be allowed to escape punishment by showing that he acted in good faith, without negligence, and in ignorance of the existence of the circumstances rendering the act unlawful. If the language and subject-matter of the statute show clearly that this was the intention of the Legislature, the courts must give it effect, however harshly the statute may seem to operate in the particular instance.". . .' [Citation.]" (*Id.*, at pp. 175-176.)

The public policy interest in providing physically handicapped persons with equal access to public facilities warrants the enactment of a statute prescribing liability for denial of access without reference to the violator's intent.

Our interpretation that section 54.3 contains no intent element does not preclude the possibility that in some instances denial of access under the statute may be excused, e.g., where the violator has been affirmatively directed, or given formal approval, by an enforcing agency to construct premises in a certain way, or maintain a configuration, which does not comply with the code requirements. However, the evidence of the manner in which Cafe Royale proceeded in the instant case is simply not enough. An informal meeting over the counter with an unidentified building department employee does not suffice to excuse compliance. The architect Morrison himself testified in respect to such a preliminary inquiry to the building department: "They don't approve anything. They give you their impression—their interpretation of the Code and whether the drawing that you're showing them at the moment seems to comply with that."

The judgment in favor of Cafe Royale on the second cause of action must be reversed but we have determined that a new trial on the question of

damages is unnecessary. The trial court should enter a judgment in favor of Donald in the amount of $250. A further trial on the issue of damages is not required as the trial court's finding that Donald suffered no actual damages by the denial of access is supported by substantial evidence. (See *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 277 [245 Cal.Rptr. 873], cert. dism. 490 U.S. 1086 [104 L.Ed.2d 673, 109 S.Ct. 2114].) The only evidence offered on the issue of damages was a brief comment by Donald. When asked how he felt after learning the tables in the bar area were the only accessible dining tables, Donald testified: "Well, it's not an unusual occurrence for this to happen and my reaction generally is negative in this situation and this time I was especially negative because I had made a special trip to San Francisco for the purpose of having dinner with Marivic and it was—it was upsetting." Donald stated he went to the restaurant with a specific social purpose, to have a nice evening with Mabanag, and the denial of access defeated this purpose. Actual damages beyond the $250 statutory minimum have not been proven by this evidence.

■ Additionally, we find unavailing Donald's argument that the trial court was in error in limiting testimony concerning his good faith purpose in visiting the restaurant. During Mabanag's direct examination by Donald's counsel, the trial court sustained defense counsel's objection when Mabanag was asked whether she had any reason to think Cafe Royale would or would not be accessible. Donald claims that the court's denial of damages based on the finding that no evidence of damages had been shown is reversible error inasmuch as the court's own ruling limited the introduction of testimony on the issue of his good faith in visiting the restaurant.

A review of the record, however, shows that evidence as to Donald's social purpose was introduced. Following the court's ruling, Mabanag's testimony was admitted to the effect that Donald and she had gone to the restaurant specifically for the purpose of having dinner. Additionally, Donald testified that he was going out with Mabanag for social reasons and that he came from Sacramento in order to go out to dinner with her at a restaurant she had selected. Donald did not know where they were going. He had never heard of the Cafe Royale before. He only knew that Mabanag wanted to go to a new restaurant and it was his experience that new restaurants were generally accessible. He testified that upon entering the restaurant he had no reason to believe it was inaccessible to physically handicapped. Donald became upset when he realized he was unable to eat in the main dining area without being lifted up the stairs. He testified the inaccessibility of the restaurant upset him and destroyed the evening for him. Evidence as to Donald's good faith in visiting the restaurant was clearly admitted. Reversible error is not shown in this regard.

## IV

■ Donald's first cause of action sought damages for Cafe Royale's noncompliance with the access statutes and regulations as set forth in sections 19955 et seq., and 4450 et seq.

That the handicap access provided by Cafe Royale violated the regulatory statutes cited is undisputed. In *People* ex rel. *Deukmejian* v. *CHE, Inc.*, *supra*, 150 Cal.App.3d at page 134, the Court of Appeal analyzed whether a separate restaurant entrance for the physically handicapped violated the equal access provisions under Health and Safety Code section 19955 and Government Code section 4450. The *CHE* court concluded that equal access had been denied and reversed the summary judgment entered in favor of the restaurant on the plaintiff's action to compel legally sufficient access. (*Ibid.*) The physically handicapped entrance provided by the restaurant in *CHE* was comprised of entry through an employee door and a route through the kitchen and scullery area. The court held that in order to constitute equal access, a separate primary entrance "must necessarily be burdened by a substantial flow of pedestrian traffic . . . ." (*People* ex rel. *Deukmejian* v. *CHE, Inc.*, *supra*, 150 Cal.App.3d at p. 135.) "We believe the law is intended to promote accommodation of the physically handicapped by insuring them access to public restaurants without facing the unnecessary, adverse psychological impact of being separated from regular customer traffic and shunted through secondary entrances." (*Id.*, at pp. 135-136.) Notably, *CHE* involved an action by the Attorney General and the Director of the State Department of Rehabilitation against a restaurant operator, the city of its location and the city's building director, to compel compliance with the equal access statutes.

Similarly, the separate and limited accommodations for dining at Cafe Royale for the physically handicapped did not constitute equal access. Viewing the evidence in the light most favorable to the respondent Cafe Royale, as we must (see *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]) only four, or possibly five, of the twenty-six tables in the restaurant were accessible to the physically handicapped. These tables were located in the lower level lounge area, separate from the two raised tiers of the main dining area. The able-bodied patrons were afforded the ambience of dining on raised tiers, while wheelchair-confined patrons were relegated to an area in the bar adjacent to the piano.

Although Cafe Royale was not in compliance with section 19955 et seq. and section 4450 et seq., we have determined that reversal of the judgment in respect to the first cause of action is not required, as these statutes do not

provide a cause of action for *damages* independent of section 54 et seq. to a physically disabled *individual* denied access.

Sections 19955 et seq., 4450 et seq. and 54 et seq., taken together, provide for a two-fold procedure. A designated public agency or an individual may initiate an action to *enforce compliance* with the handicapped access standards provided for by section 19955 et seq. and section 4450 et seq.[7] On the other hand, to maintain an action for *damages* pursuant to section 54 et seq. an individual must take the additional step of establishing that he or she was denied equal access on a particular occasion. Thus, Donald was entitled to an award of damages in the instant case on his second cause of action but not based on the first cause of action. For example, let us take a restaurant that is required to have 100 percent of its dining area accessible to the handicapped, but in fact only 90 percent of the dining area meets this standard. If a handicapped individual is readily seated and served in the 90 percent primary dining area which meets all handicap access requirements, then he or she would not have a cause of action for damages for denial or interference with admittance pursuant to Civil Code section 54.3, but an individual or a designated public agency could pursue an action under one of the enforcement provisions to bring about full compliance by the restaurant.

V

■ Donald also challenges the trial court's denial of injunctive relief under section 55, as set forth in his third cause of action. By his complaint, Donald sought a preliminary and permanent injunction prohibiting the Cafe Royale from operating the restaurant in violation of Health and Safety Code section 19955, Government Code section 4450 and title 24 of the California Code of Regulations, as well as section 54 et seq. As we have stated, the court determined such a remedy would be an "idle act" in view of the fact that Cafe Royale was no longer in business, was insolvent and dissolved as a corporation. Additionally, the court denied injunctive relief

---

[7]Section 19958 of the Health and Safety Code provides in pertinent part: "The building department of every city, county, or city and county shall enforce this part within the territorial area of its city, county, or city and county. The responsibility for enforcing Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code in its application under this part shall be by such building department within the territorial area of its city, county, or city and county."

Further section 19958.5 provides: "The district attorney, the city attorney, the Department of Rehabilitation acting through the Attorney General, or the Attorney General may bring an action to enjoin a violation of this part." In a related provision Government Code section 4458 provides: "The district attorney, the city attorney, or the Attorney General may bring an action to enjoin a violation of [section 4450 et seq.]." Also, an individual aggrieved or potentially aggrieved by a violation of Government Code section 4450 and Health and Safety Code section 19955 may bring an injunction action under Civil Code section 55.

on the ground that it would serve no "public or private good." Donald contends that the judgment on this cause of action is without evidentiary or legal support. We disagree.

Section 55 provides in part: "Any person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code, Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code, or Part 5.5 (commencing with Section 19955) of Division 13 of the Health and Safety Code may bring an action to enjoin the violation."

■ The denial of an injunction is within the sound discretion of the trial court and will be upheld on appeal absent an abuse of discretion. (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 964-965 [218 Cal.Rptr. 839].) ■ A change in circumstances, rendering injunctive relief moot or unnecessary, justifies the denial of an injunction. (See *Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423]; see 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 281, pp. 240-241.) Injunctive relief will be denied where, at the time of the order or judgment, no reasonable probability exists of the recurrence of the past acts. An injunction should not be granted as punishment for past acts where it is unlikely that they will recur. (*Mallon* v. *City of Long Beach*, *supra*, 164 Cal.App.2d at p. 190.)

■ The record shows that during the course of this litigation Cafe Royale, Inc., ceased operating the restaurant and that another restaurant, owned and operated by a different corporation and individuals, is now at the location. The president of Cafe Royale, Inc., Sam DuVall, testified that even before Donald filed the instant complaint against the corporation, the restaurant was not operating profitably. By the time of trial on Donald's complaint, DuVall had closed the Cafe Royale.

In his prayer for relief pursuant to section 55, Donald asked: "That defendants be enjoined from operating the CAFE ROYALE as a public accommodation and enjoined from operating such restaurant as an eating facility open to the public, so long as handicapped persons are not provided full access to the accommodations, including entry to the restaurant as required by law or are wrongfully discriminated against in any way, as provided by Sec. 54, et seq. of the Civil Code . . . ." That this cause of action is moot is demonstrated by the fact that the precise relief requested in the complaint was achieved by the time of trial. The trial court did not err in denying injunctive relief.

## VI

■ Cafe Royale was determined to be the prevailing party on the section 55 cause of action for injunctive relief, and was awarded $12,000 in

attorney fees. Donald contends that the trial court erred in designating Cafe Royale as the prevailing party for purposes of an award of attorney fees. We agree.

 It is well settled that a decision on the matter of attorney fees is within the trial court's discretion and will not be disturbed on appeal absent a clear abuse of discretion. (*In re Marriage of Popenhager* (1979) 99 Cal.App.3d 514, 525 [160 Cal.Rptr. 379].) In pertinent part, section 55 provides: "The prevailing party in the action shall be entitled to recover reasonable attorney's fees." In view of the fact that Cafe Royale was indisputably in violation of the handicap access requirements, the determination that Cafe Royale "prevailed" for purposes of attorney fees on the injunction cause of action constitutes an abuse of discretion.

The definition of a "prevailing party" in section 1032, subdivision (a)(4) of the Code of Civil Procedure includes "a defendant where neither plaintiff nor defendant obtains any relief." However, this definition is qualified by the limitation "unless the context clearly requires otherwise." (Code Civ. Proc., § 1032, subd. (a).) Moreover, a plaintiff will be considered a prevailing party where the lawsuit was the catalyst motivating the defendants to modify their behavior or the plaintiff achieved the primary relief sought. (See *California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 741 [246 Cal.Rptr. 285] [analyzing "prevailing party" within the context of Code Civ. Proc., § 1021.5, the private attorney general doctrine].)

The legal and factual context of the instant case compels the conclusion that Cafe Royale cannot be considered the prevailing party for purposes of attorney fees on the section 55 cause of action. Injunctive relief was denied for the express reason that the restaurant was no longer in business, not because access violations had not been demonstrated. Furthermore, evidence in the record indicates and the court determined that Cafe Royale ceased operation due to the fact that the costs of compliance with access requirements would not have permitted operation of a profitable restaurant.

In the instant case Donald filed his section 55 cause of action in order to enjoin Cafe Royale's operation in violation of the pertinent statutes and administrative code provisions. The cessation of Cafe Royale's operation of the restaurant achieved that result. Under these circumstances, it was an abuse of discretion for the court to determine that by going out of business and rendering the issue moot, Cafe Royale "prevailed" for purposes of attorney fees. Neither party prevailed for purposes of an award of attorney fees on the cause of action for injunctive relief.

CROSS-COMPLAINT

VII

■ Earlier in the proceedings below, the court sustained Donald's demurrer without leave to amend on Cafe Royale's cross-complaint. Donald contends the court erred in denying his request for entry of judgment on the cross-complaint. We agree. An order sustaining a demurrer without leave to amend is not a final judgment; a judgment of dismissal follows such an order as a matter of course. (*Berri* v. *Superior Court* (1955) 43 Cal.2d 856, 860 [279 P.2d 8].)

DISPOSITION

VIII

The judgment in favor of Cafe Royale on Donald's first cause of action, seeking damages pursuant to sections 19955 et seq. and 4450 et seq., is affirmed.

The judgment in favor of Cafe Royale on Donald's second cause of action, seeking damages pursuant to section 54 et seq., is reversed and remanded, and the superior court is directed to enter judgment on this cause of action in favor of Donald, awarding him damages in the amount of $250, and awarding him attorney fees in an amount determined by the superior court in accordance with section 54.3.

The judgment in favor of Cafe Royale on Donald's third cause of action, seeking injunctive relief, is affirmed, except that the portion of the judgment and the order awarding Cafe Royale attorney fees pursuant to section 55 is reversed, and neither party is to be awarded attorney fees pursuant to this section.

The superior court is directed to enter judgment in favor of Donald on Cafe Royale's cross-complaint.

Donald shall be awarded his costs of suit at trial on appeal.

White, P. J., and Strankman, J., concurred.

A petition for a rehearing was denied March 23, 1990.