**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MAURIZIO ANTONINETTI,
      *Plaintiff-Appellant, Cross-*
                  *Appellee,*

      v.

CHIPOTLE MEXICAN GRILL, INC.,
      *Defendant-Appellee, Cross-*
                *Appellant.*

Nos. 08-55867,
08-55946,
09-55327,
09-55425

D.C. No.
3:05-cv-01660-J-
WMC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
April 7, 2010—Pasadena, California

Filed July 26, 2010
Amended September 22, 2010

Before: Daniel M. Friedman,* Dorothy W. Nelson, and
Stephen Reinhardt, Circuit Judges.

Opinion by Judge Friedman

---

*Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

15999

## COUNSEL

Amy B. Vandeveld, San Diego, California, for the plaintiff, appellant and cross-appellee.

John F. Scalia (argued), Matthew H. Sorensen, Virginia E. Robinson, Greenberg Traurig L.L.P., McLean, Virginia, Gregory F. Hurley, Greenberg, Traurig, L.L.P., Irvine, California, for the defendant, appellee, and cross-appellant.

## ORDER

The opinion filed July 26, 2010 is amended as follows. On page 10643 of the slip opinion, after the sentence, "We must therefore be 'particularly cautious' regarding 'credibility determinations that rely on a plaintiff's past [Disabilities Act] litigation.' *Id*.," insert the following text:

> Such caution is especially appropriate in this case where, as previously noted, Chipotle stipulated that "Antoninetti wants to be able to have the 'Chipotle experience.' " Accordingly, there can be no doubt that Antoninetti wanted to return to the Chipotle restaurants to enjoy the same experience that other non-disabled Chipotle customers could have. The district court's finding thus is inconsistent with and totally undermined by the parties' stipulation.

With these amendments, the petition for rehearing is DENIED. No judge has requested a vote on the petition for

rehearing en banc. The petition for rehearing en banc is DENIED. No further petitions will be entertained.

---

## OPINION

FRIEDMAN, Circuit Judge:

This case presents several issues involving the application of the Americans with Disabilities Act ("Disabilities Act" or "Act") to a wheelchair-bound customer of the well-known Mexican fast-food restaurants operated by Chipotle Mexican Grill, Inc. ("Chipotle"). The question on the merits is whether the actions Chipotle took to accommodate the customer's disability satisfied the requirements of the Act and its implementing guidelines. We hold that they did not and accordingly that Chipotle violated the Act. Another question is whether the district court erred in denying the customer injunctive relief. We hold that, under the circumstances, the district court should grant injunctive relief. We also vacate the district court's award of attorney's fees, which was substantially less than the customer had sought, and direct reconsideration of the amount of the fee in light of our ruling on the merits. We affirm-in-part, reverse-in-part, vacate-in-part, and remand to the district court for further proceedings.

I

A. The case arises out of visits by the appellant, Maurizio Antoninetti, to two Chipotle restaurants in California, one in San Diego and one in Encinitas. Antoninetti is a paraplegic who uses a wheelchair for mobility. He visited the San Diego restaurant six times, four times as a customer and twice to gather evidence for this litigation. He visited the Encinitas restaurant twice, once as a customer and once in connection with discovery proceedings in this case.

The physical arrangements of the two restaurants were, insofar as the issues in this case are involved, substantially the same. Customers walk along a line that is next to a long counter containing the different foods that are available and on which the customers' individual orders are prepared. The customers' walking line is separated from this "food preparation counter" by a separator wall. This wall rises 45 inches above the floor; the food preparation counter is 34-35 inches high.

As customers proceed through the line, they see the different foods available by looking over the wall, and they tell the food service employees behind the food preparation counter what they want. There are many kinds of foods available—such as salsa, guacamole, cheese, and lettuce—and each ingredient is described on written menus in the restaurant as well as on large menu boards above the food preparation counter. The employees then assemble the customer's order—customizing the burrito, taco, or other Mexican food selected—while the customer watches.

At the end of the food preparation counter is a 4 foot-long counter containing the cash register and a 2-3 foot-long empty space. This counter, called the "transaction station," is 34 inches high, and is where the customer pays for and receives the order. The wall ends where this counter begins. Beyond the transaction station is a dining room with fixed seating, which customers may use after receiving their order.

The serving area of the restaurant is shown in the first photograph below. The second photograph shows the displayed food, as seen from above.



The parties stipulated that the average eye level of persons in wheelchairs is 43 to 51 inches above the restaurant floor; and that, at a distance of 12 inches from the wall, a person at any height within that average range cannot see the food preparation counter or the food on display there.

According to Chipotle, it "strives to offer a unique experience consisting of the architecture, décor, and music of its restaurants, the aroma of the food, the appearance of a customer's entrée, friendly staff, a tradition of excellent customer service, [the] ability to customize one's entrée, and . . . the taste of the food." It describes this as the "Chipotle experience."

Prior to this litigation, Chipotle had an unwritten policy of accommodating customers in wheelchairs who wanted to see the available food ingredients or watch the preparation of their food. When customers in wheelchairs so indicated, employees were required to show them samples of the available foods in serving spoons, held in tongs or in plastic portion cups, or to assemble the food either at the "transaction station" or at a table in the restaurant's seating area.

In February 2007, because of this litigation, Chipotle adopted its written "Customers With Disabilities Policy" (the "written policy"). This policy provides that "the restaurant staff will offer . . . [a] customer with a disability (for example, a visual or mobility impairment)"

> a suitable accommodation based on the individual circumstances, and will be responsive to the customer's requests. Depending on the circumstances, our crew member or manager may ask the customer if we can accommodate them during their visit. Examples of some of the ways we accommodate individuals include:
>
>     1. Samples of the food can be placed in soufflé cups and shown or handed to the customer.
>
>     2. Some customers may prefer an opportunity to see or even sample the food at a table.
>
>     3. Customers may simply wish to have the food or food preparation process described to them.
>
>     4. Or combinations of the above accommodations with any other reasonable

accommodation requested or appropri-
ate for the individual.

Antoninetti has not visited either restaurant since this writ-
ten policy was implemented. The parties have stipulated,
however, that Antoninetti still wishes to enjoy the "Chipotle
experience"—seeing all the ingredients on display and watch-
ing his burrito assembled and rolled—quickly and without
inconveniencing employees or other customers.

B.    Following his experiences as a customer in the two
restaurants, Antoninetti filed the present suit against Chipotle
in the United States District Court for the Southern District of
California. He alleged that Chipotle's treatment of
wheelchair-bound customers violates the Disabilities Act. He
sought injunctive relief and damages under a California stat-
ute that authorizes damages for violations of the federal Dis-
abilities Act.

After granting partial summary judgment and holding a
bench trial, the district court:

1.    Held that Chipotle's earlier unwritten policy for
accommodating customers in wheelchairs violated the Dis-
abilities Act, but that its current "written policy" complied
with the Act;

2.    Denied injunctive relief;

3.    Held that Antoninetti was a prevailing party in the liti-
gation, and awarded him attorney's fees of
$136,537.83—considerably less than he had sought; and

4.    Awarded him $5,000 under the California damages
statute (discussed in part V below).

II

[1] Title III of the Disabilities Act requires that "public
accommodations" built for first occupancy after January 26,

1993, be "readily accessible to and usable by individuals with disabilities." *See* 42 U.S.C. § 12183(a)(1). To satisfy this standard, "[n]ew construction and alterations . . . [must] comply with the standards for accessible design" promulgated by the Attorney General of the United States. *See* 28 C.F.R. 36.406(a). The Attorney General has issued detailed, primarily architectural, standards—known as the Guidelines—that govern the applicability of the Act to a variety of public accommodations. Failure to comply with the Guidelines constitutes prohibited "discrimination for the purposes of" the Disabilities Act. *See* 42 U.S.C. § 12183(a). The parties do not dispute that the two Chipotle restaurants are places of public accommodation, built after January 26, 1993, and therefore must comply with the Guidelines. Not surprisingly, the parties disagree about which Guideline governs this case.

**[2]** A.    Antoninetti argues that Guideline § 4.33.3 applies to Chipotle's food preparation counters. That Guideline provides, in pertinent part:

> **Placement of Wheelchair Locations**. Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

28 C.F.R. § 36, App. A, § 4.33.3. Antoninetti argues that because Guideline § 4.33.3 guarantees "lines of sight comparable to those for members of the general public," the wall

violates that Guideline because it prevents customers in wheelchairs from seeing the food preparation counter. The district court granted summary judgment to Chipotle on this contention, holding that the plain language of this Guideline does not cover Chipotle's food preparation counter. We agree.

**[3]** The basic flaw in Antoninetti's contention is that Guideline § 4.33.3 deals with the "[p]lacement of [w]heelchair [l]ocations" as "an integral part of any fixed seating plan." *Id.* The food service area of the two restaurants is not "part of any fixed seating plan," because there are no seats there, fixed or mobile, nor any "wheelchair locations" that have been "place[d]." The customers move through the service line, past the food preparation station, and on to the cash register. Only after doing so do they proceed to the seating area in the restaurant.

Furthermore, Guideline § 4.33.3 does not govern here because it addresses a different situation, namely the accessibility for the handicapped of fixed-seating structures in which people view performances or events, such as theatres, concert halls, athletic stadia, and the like. *See, e.g.*, *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 583 (D.C. Cir. 1997). Guideline § 4.33.3 requires "admission prices and lines of sight comparable to those for members of the general public." 28 C.F.R. § 36, App. A, § 4.33.3. It also requires that "[a]t least one companion fixed seat shall be provided next to each wheelchair seating area" and that "[w]hen the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location." *Id.*

B.  Chipotle argues, and the district court held, that Guideline § 7.2 provides the governing standard here. That Guideline, titled "Sales and Service Counters, Teller Windows, Information Counters," (in § 7.2(2)) provides:

> At ticketing counters, teller stations in a bank, registration counters in hotels and motels, box office

ticket counters, and other counters that may not have a cash register but at which goods or services are sold or distributed, either:

    (i) a portion of the main counter which is a minimum of 36 [inches] . . . in length shall be provided with a maximum height of 36 [inches] . . . or

    (ii) an auxiliary counter with a maximum height of 36 [inches] . . . in close proximity to the main counter shall be provided; or

    (iii) equivalent facilitation shall be provided (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with disabilities can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).

28 C.F.R. § 36, App. A, § 7.2(2).

We agree with the district court that this provision applies. The food service areas of the two restaurants are "counters" and the preparation of the customers' food orders is the sale and distribution of "goods or services." The "goods" are the food itself, and the "services" are the preparation of the meal the customer orders.

**[4]** C.   The next question is whether the two restaurants comply with that Guideline, which includes the requirement that "a portion of the main counter" have "a maximum height" of 36 inches. Chipotle contends that this requirement is satisfied because the food preparation counter adjoins the transaction station, which is 34 inches high, and therefore that

either a "portion of the main counter" or an "auxiliary counter" is below the 36 inch maximum height. The district court properly rejected this argument.

**[5]** Under the Guidelines, the food preparation counter and the transaction station are different entities, even though they are next to each other and adjoined. As the district court stated, these counters "serve different functions." The food preparation counter is where the different food products are located, the customers view, select, and customize the burrito, taco, or other Mexican food they select, and the food service employees prepare the order. The transaction station, which includes the cash register, is where customers pay for and collect the food they have ordered. Because the portion of the counter that Chipotle relies on as being less than 36 inches high is neither a "portion of the main" food preparation counter nor an "auxiliary" food preparation counter, the requirements of either Guideline §§ 7.2(2)(i) or 7.2(2)(ii) are not met. In these circumstances, the wall conceals the food preparation counter from wheelchair-bound customers and thus prevents those customers from having the experience of non-disabled customers of fully participating in the selection and preparation of their order at the food preparation counter. The wall subjects them to a disadvantage that non-disabled customers do not suffer.

**[6]** D.   Guideline 7.2(2) provides that, if a counter does not meet the height requirements set forth in § 7.2(2)(i) or § 7.2(2)(ii):

> [E]quivalent facilitation shall be provided: (e.g., at a hotel registration counter, equivalent facilitation might consist of: (1) provision of a folding shelf attached to the main counter on which an individual with disabilities can write, and (2) use of the space on the side of the counter or at the concierge desk, for handing materials back and forth).

28 C.F.R. § 36, App. A, § 7.2(2)(iii). The Guidelines define "[e]quivalent facilitation" as:

> Departures from particular technical and scoping requirements . . . by the use of other designs and technologies . . . where the alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility.

*Id.* § 36, App. A, § 2.2.

The district court held that Chipotle's written policy constituted "equivalent facilitation," but that its prior unwritten policy did not, because the written policy "imposes two new requirements," namely:

> (1) . . . [I]t is the responsibility of the manager on duty at the [r]estaurant, rather than his or her crew members, to carry out the policy . . . and (2) . . . [T]he manager on duty must affirmatively inform the customer with a disability of the various accommodations options without waiting for the customer to request them through oral communications or non-oral cues.

**[7]** Initially, the parties dispute whether any "policy" may constitute "equivalent facilitation." The issue, however, is not the form in which a policy is adopted and applied, but whether the substance of the policy satisfies the Guideline requirements of "equivalent facilitation." The two "new requirements" of the written policy that the district court relied on to show "equivalent facilitation" are unavailing because they relate only to the manner of applying that policy, not its substance.

**[8]** As noted, the presence of the wall in the two restaurants significantly reduced Antoninetti's ability to enjoy the "Chipotle experience." From his wheelchair, he could not see

and evaluate the various available foods and decide which or how much of each he wanted. He also could not watch the food service employee combine those ingredients to form his order. The substitutes that Chipotle provided—showing him samples of the individual foods in serving spoons, held in tongs or in plastic cups, or assembling the food at the "transaction station" or at a table in the seating area—do not constitute "equivalent facilitation" because they do not involve "use of other designs and technologies" or "provide [him with] substantially equivalent or greater access to and usability of the facility." They merely provide a substitute experience that lacks the customer's personal participation in the selection and preparation of the food that the full "Chipotle experience" furnishes.

In light of this conclusion, we need not decide whether, as Antoninetti and the *amici* argue, "equivalent facilitation" requires that the facilitating "alternative designs and techniques" be architectural or physical, and cannot be a particular kind of service or policy.

**[9]** In sum, Chipotle's treatment of Antoninetti during his visits as a customer of the two restaurants violated the Disabilities Act, because it did not comply with the Guidelines.

### III

**[10]** The enforcement provisions of the Disabilities Act, 42 U.S.C. § 12188, provide that the "remedy and procedures" of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a), are available "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter." 42 U.S.C. § 12188(a)(1). The referenced provision of the Civil Rights Act states that a "person aggrieved" by a violation of that Act may file "a civil action for preventive relief, including an application for a permanent or temporary injunction." 42 U.S.C. § 2000a-3(a). The Disabilities Act provides

that, in cases of discrimination in places of public accommodation,

> injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

42 U.S.C. § 12188(a)(2).

Injunctive relief is the sole remedy available to private parties under the Disabilities Act; it does not authorize a claim for money damages. *See, e.g.*, *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).

Antoninetti sought an injunction requiring Chipotle to lower the wall that prevented wheelchair-bound customers from observing the food preparation counters in the two restaurants.

The district court denied an injunction. It applied the traditional equity test: injunctive relief is appropriate when a party demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The court found that Antoninetti had failed to show irreparable injury because he had not revisited either restaurant after Chipotle adopted its written policy and because his "purported

desire to return to the [r]estaurants is neither concrete nor sincere or supported by the facts." It also stated that Antoninetti's "history as a plaintiff in accessibility litigation supports this Court's finding that his purported desire to return to the [r]estaurants is not sincere. Since immigrating to the United States in 1991, Plaintiff has sued over twenty business entities for alleged accessibility violations, and, in all (but one) of those cases, he never returned to the establishment he sued after settling the case and obtaining a cash payment."

Courts must tread carefully before construing a Disability Act plaintiff's history of litigation against him. As we have noted more than once, "[f]or the [Disabilities Act] to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the [Disabilities Act]." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007) (citing Samuel R. Bagnestos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 5 (2006))). We must therefore be "particularly cautious" regarding "credibility determinations that rely on a plaintiff's past [Disabilities Act] litigation." *Id.* Such caution is especially appropriate in this case where, as previously noted, Chipotle stipulated that "Antoninetti wants to be able to have the 'Chipotle experience.' " Accordingly, there can be no doubt that Antoninetti wanted to return to the Chipotle restaurants to enjoy the same experience that other non-disabled Chipotle customers could have. The district court's finding thus is inconsistent with and totally undermined by the parties' stipulation.

[11] In any event, in its present posture, this is a quite different case from the one the district court decided. We have held that the wall in the two restaurants violates the Disabilities Act, and that neither Chipotle's new or old policies ameliorated the violation. Considering all the circumstances,

including particularly the statutory violations we have found and the fact that an injunction is the only relief available to a private party under the Act, it would be an abuse of discretion for the district court now to deny injunctive relief.

**[12]** Accordingly, we shall reverse the district court's denial of such relief and remand the case with instructions to that court to enter an appropriate injunction. The precise contours of such an injunction are for the district court to determine in the first instance.

In view of that conclusion and disposition, we need not address the question, which the parties vigorously dispute but which the district court did not decide, whether the Disabilities Act authorizes a district court to deny injunctive relief after finding a violation of the Act. This court has refrained from deciding "whether the [Disabilities Act] forecloses the possibility that a court might exercise its equitable discretion in fashioning relief for violations" of the Act. *See Long v. Coast Resorts, Inc.*, 267 F.3d 918, 923 (9th Cir. 2001). It has stated, however, that "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief." *Silver Stage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (quoting *Burlington N. R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074 (9th Cir. 1991); *see also Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1040 (9th Cir. 2009) (noting that injunctive relief under the "stay put" provision of the Individuals with Disabilities Education Act "requires no specific showing on the part of the moving party, and no balancing of equities by the court").

IV

**[13]** Under the Disabilities Act, "the court . . . in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C.

§ 12205. As the Supreme Court recently reiterated, under federal fee-shifting statutes "the lodestar approach" is "the guiding light" in determining a "reasonable" fee. *See Perdue v. Kenny A.*, 599 U.S. ___, ___, 130 S. Ct. 1662, 1671-73 (2010) (internal quotation marks omitted). Under that method, the court first determines the appropriate hourly rate for the work performed, and then multiplies that amount by the number of hours properly expended in doing the work. *Id.* Although "in extraordinary circumstances" the amount produced by the lodestar calculation may be increased, "there is a strong presumption that the lodestar is sufficient." *Id.* at 1669.

In its two opinions determining a reasonable attorney's fee in this case, the district court apparently applied the lodestar method. Neither order explicitly stated or explained the hourly rate that the court used. Antoninetti's lawyer stated at the hearing on attorney's fees that she was "requesting" an hourly rate of $375, which Chipotle did not challenge; the district court apparently used this figure in its calculations.

The district court held that the fee awarded should reflect the "limited success" Antoninetti achieved. The court pointed out that he had prevailed on only two of his claims: that Chipotle's earlier policy violated the Act, and that he was entitled to damages under the California statute. The district court ruled that Antoninetti's "billing records make it impossible for the Court to identify specific hours associated with unsuccessful claims" and that it was "appropriate to simply reduce the award by a designated amount."

Antoninetti sought attorney's fees of $546,151.33. Because of his limited success, the court "F[OU]ND[ ] that plaintiff is entitled to one-quarter of the attorneys' fees that he has requested," and awarded him $136,537.83.

The results of this litigation are now quite different than they were when the district court made that award. Under our decision today, Antoninetti has prevailed on the two major

issues that he lost before the district court. We have held that Chipotle's treatment of him in the two restaurants violated the Disabilities Act, and that the district court must provide injunctive relief.

**[14]** In light of this changed outcome, the district court should reexamine and reconsider its attorney's fee award. We express no view on what would be a reasonable fee in light of the changed circumstances. That determination is one that initially is for the informed discretion of the district court.

V

The California Disabled Persons Act ("California Act") provides that violation of an individual's rights under the Disabilities Act also constitutes a violation of the California Act. Cal. Civ. Code § 54(c). One who commits such violation is "liable for each offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($1,000), and attorney's fees as may be determined by the court in addition thereto." Cal. Civ. Code § 54.3.

**[15]** In order "to maintain an action for damages pursuant to [the California Act] an individual must . . . establish[ ] that he or she was denied equal access on a particular occasion." *Donald v. Café Royale, Inc.*, 218 Cal. App. 3d 168, 183 (Cal. Ct. App. 1990) (emphasis omitted). Antoninetti therefore must show that "he actually presented himself to the restaurant on a particular occasion, as any other customer would do, with the intent of being . . . served and to purchase food . . . in the manner offered . . . . [and] actually encountered access to . . . the restaurant that was not full and equal." *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1226 (Cal. Ct. App. 2009).

Antoninetti made eight visits to the two restaurants, five as a customer and three in connection with his lawsuit. The dis-

trict court awarded him $1,000 damages under the California Act for each of his five visits as a customer, but did not make any award for his three litigation-related visits. The record indicates that these damages awards were based on Chipotle's violations of the Guidelines in the restaurants' parking lots (an issue not here disputed), not on the violations of the Act in the food service areas that we have found. Chipotle has since rectified the parking lot violations. In his notice of appeal, Antoninetti challenges the district court's judgment "with respect to the denial of additional damages . . . based upon violations of the Americans with Disabilities Act by Chipotle . . . . [but] does not appeal the amount of damages already awarded."

**[16]** The violations of the Disabilities Act we have found are that, because of the wall, Antoninetti was unable to see the food arranged on the food counter or the preparation of his order, as non-wheelchair-bound customers could do, and thus was unable to enjoy the "Chipotle experience." Those violations necessarily occurred only when he visited the restaurants to purchase food and sat in line in his wheelchair. On those visits when he was not seeking to purchase food or to have the "Chipotle experience," Antoninetti cannot recover money damages under the California Act.

It is unclear whether Antoninetti is challenging the district court's failure to award damages for the five food service area violations we have found (in addition to the parking lot violations), or, if so, whether he has properly preserved that issue. In his notice of appeal, he challenged the district court's judgment "with respect to the denial of additional damages"—an ambiguous phrase that could cover only the litigation-related visits, or also could cover the food service area violations. The record does not show whether Antoninetti purchased food on any of his three litigation-related visits, although he stated in his opening brief: "Nor was any evidence offered at any time that Antoninetti's purchases during these [litigation-related] visits were made in bad faith or with fraud or deceit."

Moreover, the district court has not considered the amount of additional damages, if any, that should be awarded for the violations not related to parking.

[17] We vacate the damages award and remand for further proceedings on this issue.

## CONCLUSION

The judgment of the district court is affirmed insofar as it ruled that Chipotle's unwritten earlier policy violated the Disabilities Act. The portions of the judgment determining that Chipotle's written policy did not violate the Act and that Antoninetti was not entitled to an injunction are reversed, and the case is remanded to the district court to enter a judgment that Chipotle violated the Disabilities Act and to issue appropriate injunctive relief. The portions of the judgment that awarded an attorney's fee of $136,537.83 and awarded damages of $5,000 under the California Act are vacated and the case is remanded for the district court to reconsider those issues.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED.