44 A.3d 601 (2012)
426 N.J. Super. 297
Carmena STONEY, Plaintiff, and
Linda Vandeusen, Plaintiff-Respondent/Cross-Appellant,
v.
MAPLE SHADE TOWNSHIP, Defendant-Appellant/Cross-Respondent.
Docket No. A-1777-10T3.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 2012.
Decided May 11, 2012.
*604 Eric L. Harrison, Edison, argued the cause for appellant/cross-respondent (Methfessel & Werbel, P.C., attorneys; Mr. Harrison, of counsel and on the brief).
Anthony J. Brady, Jr., argued the cause for respondent/cross-appellant.
Before Judges PARRILLO, SKILLMAN and HOFFMAN.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
At issue is whether a trial court may deny injunctive relief upon a jury finding of access discrimination under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101-12213, and the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.
By way of background, plaintiff Linda Vandeusen, a South Carolina resident, has dystonia, is wheelchair dependent, and is aided by a dog. She travels to New Jersey approximately twice a year to help a disabled man, attend disability conferences, and visit friends. She is a self-acknowledged "tester,"[1] that is, "a person who goes places just to see if it is accessible for people with disabilities...."
In her travels, she visited the municipal building in defendant Maple Shade Township, constructed in the late 1980's or early 1990's. She experienced difficulty accessing the bathrooms in the basement and third floor because the doors were too heavy. Additionally, the toilets were "too low[,]" being only fifteen inches high. Plaintiff found these same conditions existed in the police station.
Plaintiff also had difficulty accessing City Hall and maneuvering West Main Street in downtown Maple Shade because of the "very steep" curb cuts and cross slopes, which she defined as a curb cut or sidewalk that "angles one way or the other, so if ... [a] ball [were placed] on the sidewalk that's supposed to be level[,] if there's a slope the ball will go one way or the other[, but] not straight." Moreover, the handicapped parking spaces needed a "bigger access [a]isle."
On about seven occasions, plaintiff visited Steinhauser Park (park), which was *605 created sometime in the 1950's. There, she observed that a sidewalk traversing and leading around the park contained a "cross-slope lean[ing] toward the ... [lake]." She had difficulty accessing the park because of this cross-slope:
Currently the sidewalk going through the park, around the park it's got that cross-slope and unfortunately the cross-slope leans toward the water. And going in to the park I keep my dog on my right. He's always on the right, so my chair is constantly pushing in him, and he's pushing me back, but leaving the park I'm going to turn around my dog's still on my right then my chair is open to the water so that my chair is going towards the water, And, I'm constantly pulling on my dog to keep me over.
Although the sidewalk traversing the park had been repaved to smooth bumps that "happe[n] over age," this neither helped nor hindered her effort at access:
This is going to sound silly, but it actually made it just different. Because when there were bumps in the sidewalk at least my wheelchair could get caught on a bump and I didn't feel like I was going to fall in the water, I was going to get dumped out on the sidewalk, and now it's just a smooth surface, and I can just fall in the water if I don't have the dog with me.
Plaintiff also could not access the park's picnic tables because they were "over grass."
Plaintiff did not seek assistance from the township in accessing these facilities, nor inform them of the conditions affecting her access. Instead, she filed a complaint against the township, alleging that as a disabled person, she was not afforded proper access to defendant's municipal building, downtown sidewalks and curb cuts, and the park, in violation of Title II of the ADA and the LAD.[2] She sought both compensatory damages and equitable relief.
At the ensuing jury trial, William Cody, an expert in ADA regulations, American National Standards Institute (ANSI) regulations, barrier free construction, and accessibility, generally corroborated plaintiff's observations of the township's facilities. According to Cody, the bathroom doors in the municipal building needed adjustment, costing approximately twenty-five dollars and the parking aisle required widening, costing approximately sixty dollars per space.
Cody believed the re-pavement of the sidewalk around and through the park occurred as recently as 2008, based upon the "very black" appearance of the asphalt. The cross slopes leading to and from the park averaged five to six percent, whereas applicable guidelines require cross slopes of accessible routes not to exceed two percent.[3] Cody opined that the repaving in the park constituted an "alteration[,]"[4] explaining *606 that if a surface is added "to the present surface then you would have to bring it up to code." To correct the cross slope of the pathway to the park, part of which constituted new construction according to Cody, would cost approximately $600 to $800. To level the surface inside the park to correct the cross slopes which, on average ranged between five and six percent, would cost approximately $6500.
To make the picnic table accessible, Cody suggested either creating "an accessible route" or moving a table down to a "concrete pad with a beveled edge to allow somebody to get up to the table...." Lowering a table and creating a concrete pad would cost "less than a [$1000]...." And it would cost about $16,000 to fix two curb cuts adjacent to the municipal building. There were also twelve problematic curb cuts along Main Street, which would cost approximately $78,000 to repair.
George Haeuber, the former City Manager of Maple Shade from 1984 to 2009, also testified and explained that there was a transition plan in place to improve access to defendant's facilities. Although recreational areas were not part of the transition plan, the township was "improving ... [those] facilities ... in accordance with ADA standards." During his tenure as City Manager, Haeuber received only two complaints regarding access to township facilities, both of which came in the form of lawsuits filed by plaintiff's counsel. Haeuber further explained if a complaint were made regarding accessibility of Maple Shade's facilities, he would ensure that someone from the applicable department would promptly render assistance.
Plaintiff moved for a directed verdict at the close of evidence, arguing that a court has no discretion to deny relief when a violation of the ADAAG is proven. The court denied the motion.
The jury found that defendant discriminated against plaintiff because of her disability by either wrongfully excluding her from or denying her access to the park and a bathroom in the Municipal Building, but rejected her other claims as to the Municipal Building, sidewalks on Main Street, and the police station. The jury awarded no compensatory damages.[5]
Post-trial, plaintiff moved for counsel fees, injunctive relief and nominal damages. She was denied the latter but succeeded on her equitable claim regarding access to the municipal building's bathrooms and to the park's picnic tables.[6] *607 The court, however, rejected her claim for injunctive relief as to access to the park, generally reasoning that plaintiff "never said she was denied access to the park, or that she could not get around the park. She merely said she had a problem with getting around in the park because her wheelchair would follow the slope of the path which circled ... a lake." Finding what it characterized as a two percent difference between the regulatory requirement and the actual cross slope of the path around the park was "de minimis[,]" the court declined to "order [defendant] to incur the expense ... to change the cross slope of the roadway around the park." Responding to defendant's counsel's representations that the township has plans to alter the park, the court stated: "if the county is going to [correct the cross slope]..., [the court] ... recommend[s] that someone bring it to the county engineer's attention of the problems alleged[] and let them correct it when they do it." The court further explained:
The jury found no irreparable damage. Money damages were zero.... And when the hardship comes down to it we come to public interest. And that is the taxpayers. And heaven knows we have enough problems in this state right now with taxpayers, with schools and the courts.... [T]here's just not enough money to go around. But to then spend it on creating roadways in parks I think is a little over-spending.
Lastly, the court awarded plaintiff $47,000 in counsel fees and costs.
Defendant appeals from the counsel fee award. Plaintiff cross-appeals, primarily contending the court erred by denying her injunctive relief in the form of a handicapped-accessible route in and around the park and also by giving defendant the option of adding one handicapped-accessible picnic table or removing all picnic tables. Plaintiff also challenges the denial of her motion for a directed verdict; the court's instructions to the jury; and its failure to award her at least one dollar in nominal damages.

I
We first address whether, in light of the jury verdict finding access discrimination, the trial court has discretion to deny plaintiff the injunctive relief she requested.
Although decisions relating to injunctive relief are normally reviewed for abuse of discretion, see Horizon Health Ctr. v. Felicissimo, 135 N.J. 126, 137, 638 A.2d 1260 (1994), our review is de novo where the disputed issue is a question of law. Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779, 791-92 (1986).
Under federal law generally,
[o]nce a party has demonstrated actual success on the merits, the court must balance three factors to determine whether injunctive relief is appropriate: (1) the threat of irreparable harm to the movant; (2) the harm to be suffered by the nonmoving party if the injunction is granted; and (3) the public interest at stake.
[Layton v. Elder, 143 F.3d 469, 472 (8th Cir.1998) (Title II ADA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701-796).]
See also Midgett v. Tri-County Metro. Transp. Dist., 254 F.3d 846, 850 (9th Cir. 2001) ("In order to be entitled to an injunction [under the ADA], [a] [p]laintiff must make a showing that he [or she] faces a real or immediate threat of substantial *608 or irreparable injury."). As to the third prong, given the ADA's stated goal to eliminate discrimination against individuals with disabilities, 42 U.S.C.A. § 12101(b)(1), the "public interest strongly favors mandating accessibility." Layton, supra, 143 F.3d at 472. Cf. Jackson v. Concord Company, 54 N.J. 113, 123, 253 A.2d 793 (1969) ("prevention of unlawful discrimination [under the LAD] vindicates not only the rights of individuals but also the vital interests of the State.... such discrimination is regarded as a public wrong and not merely the basis of a private grievance.")
Because Title II of the ADA and the LAD authorize injunctive relief, see 42 U.S.C.A. § 12133; 28 C.F.R. § 36.504(a)(1); N.J.S.A. 10:5-3, -13, the question raised by this appeal is whether the three-prong balancing test set forth in Layton, supra, applies when there has been a finding of a violation of the ADA or the LAD, or is a court without discretion to deny the equitable remedy. While no New Jersey case appears to have squarely addressed this issue, federal law suggests a broader discretion where the discriminatory denial of access involves a pre-existing facility than one constructed or "altered"[7] after January 26, 1992, when Title II's implementing regulations came into effect.
For facilities constructed prior to 1992, a public entity is not "[n]ecessarily require[d] ... to make each of its existing facilities accessible to and usable by individuals with disabilities...." 28 C.F.R. § 35.150(a)(1). Rather, a public entity may satisfy Title II of the ADA by adopting a variety of less costly measures, including reassigning services to accessible facilities, assigning aides to assist persons with disabilities in accessing services, and using "accessible rolling stock or other conveyances...." 28 C.F.R. § 35.150(b)(1). Likewise, the applicable regulations under the LAD require places of public accommodation to provide reasonable accommodations. See N.J.A.C. 13:13-4.3, -4.4, -4.11,-4.12.
Stated somewhat differently, under the ADA, a deviation from the applicable guidelines (ADAAG or Uniform Federal Accessibility Standards (UFAS)) does not automatically establish public access disability discrimination for pre-existing facilities. See, e.g., Pierce v. County of Orange, 761 F.Supp.2d 915, 946 (C.D.Cal. 2011) (for pre-existing facilities constructed before 1992 and subject only to 28 C.F.R. § 35.150, compliance with applicable *609 guidelines not necessary, "[b]ut the Court may look to UFAS or ADAAG guidelines to decide whether barriers to access exist under that section"); Greer v. Richardson Indep. Sch. Dist., 752 F.Supp.2d 746, 754 (N.D.Tex.2010) ("Failure to meet ADAAG standards is relevant, but not determinative; public entities have flexibility to choose how to create program accessibility."); Access Now, Inc. v. S. Fla. Stadium Corp., 161 F.Supp.2d 1357, 1368 (S.D.Fla.2001) ("The Act does not require ADAAG compliance of existing facilities; accordingly, the court cannot determine the defendants' liability from finding that elements of the stadium deviate from those standards."). Rather, a breach of the applicable access guidelines provides "valuable guidance" for determining whether an existing facility contains architectural barriers. Hubbard v. 7-Eleven, Inc., 433 F.Supp.2d 1134, 1138 (S.D.Cal.2006) ("Although the ADAA[]G guidelines do not apply to facilities existing before the ADA's effective date, they `provide valuable guidance for determining whether an existing facility contains architectural barriers.'") (quoting Pascuiti v. New York Yankees, 87 F.Supp.2d 221, 226 (S.D.N.Y. 1999)).[8]
On the other hand, for facilities built or altered after 1992, Title II's implementing regulations expressly require compliance with specific architectural accessibility standards. 28 C.F.R. § 35.151. The ADA regulations state that the new construction or alterations "must comply" with the UFAS or the ADAAG. 28 C.F.R. § 35.151(a), (c). However, despite the regulation's mandatory language, there are exceptions to strict liability. "Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided." 28 C.F.R. § 35.151(c). Moreover, for new construction, a facility must be accessible only to the extent it is not structurally impracticable. 42 U.S.C.A. § 12183(a)(1) (Discrimination for purposes of 42 U.S.C.A. § 12182(a) includes "a failure to design and construct facilities ... that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable...."); 28 C.F.R. § 36.401(c)(2) ("[A]ny portion of the facility that can be made accessible shall be made accessible to the extent that is not structurally impracticable."); see also Long v. Coast Resorts, Inc., 267 F.3d 918, 923 (9th Cir.2001).
In Long, supra, the plaintiffs appealed the magistrate judge's ruling on summary judgment that several facilities did not violate Title III of the ADA. Id. at 923-24. In particular, the plaintiffs argued that 819 of 839 hotel rooms had bathroom doorways with a clear opening of only twenty-eight inches, in violation of the applicable guidelines that required thirty-two inches. Id. at 921-22. The magistrate judge found the bathroom doors in violation of the guidelines, but nevertheless denied injunctive relief because there had been "`substantial compliance with the spirit of the law. Considering the enormous expense required to modify the structure, and the near absence of hardship and that constituting a minimal inconvenience to wheelchair users, this Court is loathe [sic] to grant injunctive relief to Plaintiffs on *610 this issue.'" Id. at 923 (quoting lower court).
The Ninth Circuit reversed because the violation resulted in denial of access to individuals with disabilities, and the only statutory defense for noncompliance, structural impracticability, did not apply "because the terrain on which [the bathrooms were] constructed ha[d] no unique characteristics which would make accessibility unusually difficult to achieve." Ibid.; see also 42 U.S.C.A. § 12183(a)(1).
Notably, for present purposes, the Long court expressly refrained from deciding whether the ADA forecloses the possibility that a court might exercise its equitable discretion in fashioning relief for violations of § 121183(a)(1), "because there is no room for discretion here even if it exists." 267 F.3d at 923; see also Caruso v. Blockbuster-Sony Music Entm't Ctr. at the Waterfront, 193 F.3d 730 (3d Cir.1999) (the question whether a court has discretion to deny injunctive relief when a violation of Title II of the ADA is established went unaddressed).
In yet another Title III case,[9]Antoninetti v. Chipotle Mexican Grill, Inc., 614 F.3d 971 (9th Cir.2010), cert. denied, ___ U.S. ____, 131 S.Ct. 2113, 179 L.Ed.2d 926 (2011), however, the court stated that "`[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief.'" 614 F.3d at 980-81 (quoting Burlington N. R.R. Co. v. Dep't of Revenue, 934 F.2d 1064, 1074 (9th Cir.1991)).
In Antoninetti, supra, a paraplegic customer, who used a wheelchair, brought a Title III ADA action against a fast-food restaurant, alleging the restaurant failed to accommodate his disability by not affording him "lines of sight comparable to those for members of the general public...." Id. at 974, 977. The plaintiff sought an injunction requiring the restaurant to lower the wall that prevented wheelchair-bound customers from observing the food preparation counters.
Under Title III, unlike Title II, injunctive relief is the sole remedy available to private parties. Id. at 979. Despite finding that the restaurant violated ADA guidelines regarding main counter height, the district court denied the customer's motion for injunctive relief. Id. at 980. The Ninth Circuit reversed in part, holding that "[c]onsidering all the circumstances, including particularly the statutory violations we have found and the fact that an injunction is the only relief available to a private party under the Act, it would be an abuse of discretion for the district court now to deny injunctive relief." Ibid. As in Long, supra, however, the court explicitly declined to address the question "whether the [ADA] authorizes a district court to deny injunctive relief after finding a violation of the Act[,]" ibid., iterating instead the well-settled Ninth Circuit view that the traditional balancing test does not apply in such an instance. Id. at 980-81 (internal citations omitted).
Equally illustrative is Deck v. City of Toledo, 76 F.Supp.2d 816, 817 (N.D.Ohio 1999), wherein the plaintiffs sought to "enforce compliance with the standards for curb ramps set forth in the [ADA] and its accompanying regulations." In particular, on all newly constructed or altered streets, curb ramps must be provided wherever an accessible route crosses a curb and curb ramps cannot exceed 1:12. Id. at 818 (citing 28 C.F.R. Pt. 36, App. A §§ 4.7.2 & 4.8.2). The plaintiffs cited at least 302 *611 separate locations in which the defendant had violated the ADAAG regulations for curb ramps on newly constructed or repaved streets and sidewalks since 1996, all of which the defendants did not dispute. Id. at 822-23.
The court granted the plaintiffs' motion for summary judgment with respect to the defendant's failure to provide compliant curb ramps. Id. at 823. The plaintiffs also sought summary judgment on the issue of permanent injunctive relief. Id. at 824. The court found it "clear that the entry of a mandatory injunction requiring the City to bring itself into compliance with the ADA will be proper at some point in this case." Ibid. Nevertheless, it held that issuance of a permanent injunction on summary judgment was inappropriate because further discovery was "needed to identify all intersections and streets where sidewalks ha[d] been reconstructed or streets resurfaced since" 1996, and "the extent to which curb ramps installed at those locations compl[ied] with the ADA." Ibid.
Regardless of whether it is mandatory, when an injunction authorized by statute issues, the court retains wide discretion in fashioning its contents and determining its breadth and scope. In Tyler v. City of Manhattan, 857 F.Supp. 800, 818-20 (D.Kan.1994), aff'd, 118 F.3d 1400 (10th Cir.1997), the court issued a narrowly-tailored injunction against the city under Title II of the ADA based on its finding that the disabled claimant was discriminated against by exclusion from participation in certain city services, including access to a park, city buildings and where his daughter's baseball games were played. Even though the city had made progress in removing numerous architectural barriers to city buildings and recreational facilities, the court nevertheless held that some injunctive relief was in order because "absent injunctive relief, the City ... is unlikely to achieve full compliance with the mandates of the Title II regulations" and the plaintiff was thus "likely to suffer continued irreparable harm ... as a result of being denied equal participation in city services, programs, and activities." Id. at 820.
Accordingly, the court required the city to "adopt a schedule for installing necessary curb ramps in accordance with priorities established by" Title II regulations, which must include more than a "routine street maintenance plan[,]" and enjoined the city from offering recreational activities at a baseball field until it was made accessible to persons with disabilities. Id. at 820-22. On the other hand, the city's voluntary initiation of modifications to many of it recreational facilities warranted refusal of injunctive relief requiring the city to make particular modifications already identified in its architectural barrier removal project. Id. at 822.
In fashioning its limited equitable remedy, the Tyler court engaged in a balancing process, weighing, among other things, any progress made to abate the unlawful conduct, the adequacy of alternative legal remedies, and the danger of recurrent violations and irreparable harm to the complainant. Id. at 820-22.
Apart from Antoninetti, supra, we have not uncovered any authority under the ADA or the LAD for dispensing with a balancing test in favor of awarding injunctive relief outright upon a proven finding of access denial or discrimination. And to the extent Antoninetti suggests to the contrary, that case was decided exclusively under Title III of the ADA, which prescribes injunctive relief as the only available remedy to a private litigant.[10]
*612 We conclude that the better analysis for adjudicating claims for injunctive relief under Title II of the ADA and the LAD, such as the one involved here, employs a balancing of the competing claims of injury and the effect on each party of the granting or withholding of the requested equitable remedy, along with, most significantly, the compelling public interest strongly favoring accessibility. We reject the view, however, that strict liability and mandatory injunctive relief automatically flow from a showing of a breach of access guidelines or regulations. Instead, in assessing the critical factor of the likelihood of suffering continuing irreparable harm as a result of the denial of access, courts should take into account the public entity's progress in remedying the asserted violations as well as the cognizable danger of recurrent violations. See Layton, supra, 143 F.3d at 470-72.
Although under appropriate circumstances, a court may justifiably withhold injunctive relief even if it concludes that the law has been violated by the party sought to be enjoined, Tyler, supra, 857 F.Supp. at 820; see also Prows v. Fed. Bureau of Prisons, 981 F.2d 466, 469-70 (10th Cir.1992), cert. denied, 510 U.S. 830, 114 S.Ct. 98, 126 L.Ed.2d 65 (1993), in cases involving new construction or "alterations" occurring on or after 1992, irreparable harm should be presumed. See Layton, supra, 143 F.3d at 472-73; Pathways Psychosocial Support Ctr., Inc. v. Town of Leonardtown, 223 F.Supp.2d 699, 704, 717 (D.Md.2002). Indeed, in such situations, courts should be less willing to deny injunctive relief when a violation of the law is found, given the ADA's clear and comprehensive mandate for "the elimination of discrimination against individuals with disabilities[,]" 42 U.S.C.A. § 12101(b)(1), and its explicit statement of purpose, identifying the discriminatory effects of architectural barriers as evils to be addressed. Kinney v. Yerusalim, 812 F.Supp. 547, 548 (E.D.Pa.1993) (citing 42 U.S.C.A. § 12101). It has even been suggested that there is no de minimis defense under the ADA for new construction or "alterations" on or after 1992. Long, supra, 267 F.3d at 923.
Applying these principles here, we conclude the trial judge abused his discretion in denying injunctive relief as to the park because he failed to consider all relevant factors. Despite a jury finding that plaintiff was wrongfully excluded from the park, the judge concluded the slope's deviation from regulatory requirements was "de minimis" and did not deny plaintiff access altogether. Yet total inability to use the service should not have been the test. Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir.2001). In any event, there was no concomitant finding as to the extent of the impairment that went unremedied. *613 Nor was there any determination whether the pathway's recent re-pavement constituted an "alteration[,]" thereby triggering mandatory compliance with the ADA guidelines. On this score, although plaintiff requested the issue be left for jury resolution, no mention of it was made in the court's jury instructions. Nor did the court address the matter on plaintiff's post-verdict application for injunctive relief. After all, whether the re-pavement would qualify as a post-1992 "alteration" is a significant consideration in the determination of irreparable harm.[11] Equally absent from the court's analysis is any mention of the public interest or the inadequacy of legal remedies, since the jury awarded plaintiff no compensatory damages.
In stark contrast to the lack of such findings, the court simply presumed harm to the township in making the park readily accessible without any factual support whatsoever, concluding, without more, that the public interest is to the contrary. And while the court did provide for the addition of one handicapped-accessible picnic table, it essentially cancelled out that accommodation by, inexplicably, allowing the township the option of removing all picnic tables from the park.
Similarly irreconcilable is the court's assumption, on the one hand, that plaintiff's proposed modification to the cross slope would not result in a substantial change, but, on the other hand, would likely adversely upset the township's fiscal situation as well as the public interest. Although financial hardship is obviously a material consideration, we find no support in the record for the court's characterization of plaintiff's proposal as "over spending." Thus, whatever balancing the court may have engaged in that tipped in favor of the township was skewed by the omission of clearly relevant factors and its over reliance on others that lacked a factual basis.
In sum, because the requisite balancing of competing interests, impacts and harm, did not occur here, the court abused its discretion in denying plaintiff injunctive relief as to the park. Accordingly, we are constrained to remand for the proper application of the test for the grant or denial of an injunction in the context of the strong public policies enunciated in the ADA and the LAD, preceded by a determination whether, as a matter of law, the pathway's recent repavement constituted an "alteration."

II
In light of this disposition, we also vacate the attorney fee award challenged on defendant's appeal and remand to consider the degree of plaintiff's ultimate success on her claim for injunctive relief.
We start with some well-settled governing principles. Both state and federal fee-shifting statutes applicable here provide for counsel fees to the prevailing party, N.J.S.A. 10:5-27.1; 42 U.S.C.A. § 12205, and clearly plaintiff is a prevailing party. As such, "fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine v. *614 Pantzer, 141 N.J. 292, 317, 661 A.2d 1202 (1995); Shore Orthopaedic Grp., LLC v. Equitable Life Assurance Soc'y of the U.S., 397 N.J.Super. 614, 623, 938 A.2d 962 (App.Div.2008), aff'd, 199 N.J. 310, 972 A.2d 381 (2009).
"The starting point in awarding attorneys' fees is the determination of the `lodestar,' which equals the `number of hours reasonably expended multiplied by a reasonable hourly rate.'" Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21, 860 A.2d 435 (2004) (quoting Rendine, supra, 141 N.J. at 335, 661 A.2d 1202). In determining the reasonableness of a fee, the factors in R.P.C. 1.5(a) must be considered. Id. at 22, 860 A.2d 435.
"In cases where plaintiff presents `distinctly different claims for relief' in one lawsuit, work on those unrelated claims cannot be deemed in pursuit of the ultimate result achieved." Silva v. Autos of Amboy, Inc., 267 N.J.Super. 546, 556, 632 A.2d 291 (App.Div.1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434-35, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 51 (1983)). But, "when the plaintiff's claims for relief `involve a common core of facts or will be based on related legal theories,' such a suit cannot be viewed as a series of discrete claims." Ibid. (quoting Hensley, supra, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51).
"[I]f a plaintiff's unsuccessful claims are related to the successful claims, either by a `common core of facts' or `related legal theories,' the court must consider the significance of the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated." Singer v. State, 95 N.J. 487, 500, 472 A.2d 138 (quoting Hensley, supra, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51), cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984). Thus, "[i]f the results obtained are fully effective in vindicating plaintiff's rights, counsel should recover for all hours reasonably expended on the litigation." Ibid. In contrast, "if a successful plaintiff has achieved only limited relief in comparison to all of the relief sought, the court must determine whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained, ... and, if not, reduce the award proportionately" ibid., though "there need not be proportionality between the damages recovered and the attorney-fee award itself." Furst, supra, 182 N.J. at 23, 860 A.2d 435 (citing Rendine, supra, 141 N.J. at 336, 661 A.2d 1202.)
If a court decides that the lodestar fee should be reduced, it may either "attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Robb v. Ridgewood Bd. of Educ., 269 N.J.Super. 394, 405, 635 A.2d 586 (Ch.Div.1993) (citing Hensley, supra, 461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52). "[T]he decision as to the method to be used rests in the equitable discretion of the court." Ibid. Moreover, it is within the court's discretion "whether to award minimal attorney's fees or no fees at all" where a plaintiff is awarded nominal damages. Tarr v. Ciasulli, 181 N.J. 70, 87, 853 A.2d 921 (2004).
Here, plaintiff requested $73,873 in fees, which included a one-third fee enhancement. The court reduced plaintiff's billing entries, but did not detail which entries were eliminated, and also reduced counsel's hourly rate to $300 without explanation. Denying a fee enhancement because the case was not particularly complicated, the court simply multiplied 132 hours by $300 and awarded plaintiff $39,600 in fees and $7,400 in costs.
*615 Not only was this reasoning largely conclusionary, but flawed for failing to consider the results achieved. In its present posture, the fee determination did not consider plaintiff's limited success, in which the jury awarded her no compensatory damages and the court denied her nominal damages as well as her requested injunctive relief, save for access to the municipal building and a picnic table. Even the latter remedy had been effectively eviscerated by the option afforded defendant. That plaintiff's expert called for seventy-five modifications and persuaded the court as to only two should have been taken into account in the ultimate attorney fee award.
By the same token, plaintiff's claims for equitable relief as to park access will be reexamined on remand under our decision today. The results on remand may be quite different than they were when the court made the attorney fee award. Any changed outcome in favor of plaintiff would obviously be relevant in determining the propriety of her requested fee enhancement under our State's fee-shifting statute.[12] Indeed any such decision should consider whether this was the type of matter advancing the public good that would not have been brought without the promise of an attorney fee award. As the Court in Walker v. Giuffre, 209 N.J. 124, 156, 35 A.3d 1177 (2012), noted:
[Plaintiff] ... fought for changes in the accessibility of the premises to bring it into compliance with the strong protections of our civil rights laws. Her litigation served not her sole interests, but the interests of any and all who had been or who might otherwise in the future have been denied access to the premises. The relief she sought, both because it was equitable in nature and because it was designed to serve a broad social purpose, weighs in favor of a contingency enhancement at the highest end of the spectrum authorized in Rendine, supra, 141 N.J. at 292, 661 A.2d 1202.
We, of course, express no view on whether injunctive relief should issue and, if so, what would be a reasonable fee in light of the actual result achieved. Those determinations are ones that initially fall within the informed judgment of the trial court.

III
We deem the residual claims on plaintiff's cross-appeal without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).
Affirmed in part; reversed and remanded in part.
NOTES
[1] In this capacity, plaintiff has filed a total of fifty lawsuits, all alleging disability discrimination and seeking damages and counsel fees because "people with disabilities deserve access."
[2] In her complaint, plaintiff referred to the relevant provisions of the LAD's implementing regulations found in the Barrier Free Subcode, N.J.A.C. 5:23-7.10.
[3] Americans with Disabilities Act Accessibility Guidelines (ADAAG) 28 C.F.R. Pt. 36, App. A § 4.3.7 (2012); Parr v. L & L Drive-Inn Rest., 96 F.Supp.2d 1065, 1087 (D.Haw.2000). According to ANSI § 403.3: "The running slope of walking surfaces shall not be steeper than 1:20. The cross slope of a walking surface shall not be steeper than 1:48." http://www. access-board.gov/ada-aba/comparison/chapter 4.htm (last visited Feb. 28, 2012).
[4] For facilities built or "altered" after 1992, Title II's implementing regulations require compliance with specific architectural accessibility standards. 28 C.F.R. § 35.151. However, for facilities constructed prior to 1992, a public entity is not "[n]ecessarily require[d]... to make each of its existing facilities accessible to and usable by individuals with disabilities...." 28 C.F.R. § 35.150(a)(1). Rather, a public entity may satisfy Title II of the ADA by adopting a variety of less costly measures including: reassigning services to accessible facilities, assigning aides to assist persons with disabilities in accessing services, and using "accessible rolling stock or other conveyances...." 28 C.F.R. § 35.150(b)(1).
[5] At the charge conference, neither party addressed whether the jury should be questioned about whether the repavement of the park constituted new construction, nor did anyone address whether the jury should consider the ADAAG and ANSI guidelines and regulations in determining whether the park was accessible. Plaintiff's proposed jury instructions generally claimed that defendant's "new construction and alterations ... must comply with the standards of [the] ADAAG unless there is structural impracticability."

The judge did not instruct on new construction, nor did he ask the jury to determine whether there was new construction in the park. The judge also did not address whether the jury should consider the ADAAG and ANSI guidelines and regulations in determining whether the park was accessible. The judge did instruct that "in determining whether the public entity failed to make its services reasonably accessible, you should note that in the case of older facilities for which structural changes [are] likely to be more difficult, a public entity may comply with the law by adopting a variety of less costly measures...."
[6] As to the latter, the court gave defendant the option of removing all picnic tables from the park as an alternative to making at least one handicap accessible.
[7] "Alteration" for purposes of Title II of the ADA is defined at 28 C.F.R. § 35.151(b)(1):

Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.
"Resurfacing beyond normal maintenance is an alteration." Dept. of Justice, Civil Rights Div., Disability Rights Section, ADA: Title II Technical Assistance Manual, II-6.6000 (Supp.1994), available at http://www. ada.gov/taman2up.html (last visited Mar. 22, 2012). For example, the Third Circuit in Kinney v. Yerusalim, 9 F.3d 1067, 1070, 1073-75 (3d Cir.1993), cert. denied, 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994), held that Philadelphia's resurfacing of an entire street, which included "laying at least 1-1/2 inches of new asphalt, sealing open joints and cracks, and patching depressions of more than one inch" was an alteration under 28 C.F.R. § 35.151(b) and therefore triggered compliance with ADA accessibility standards. The court noted that it was "not called upon to decide whether minor repairs or maintenance trigger the obligations of accessibility for alterations under the ADA." Id. at 1070.
[8] Likewise, under the LAD, noncompliance with applicable regulations may be evidence of discrimination, but it is not determinative. See Franek v. Tomahawk Lake Resort, 333 N.J.Super. 206, 215-16, 754 A.2d 1237 (App. Div.), certif. denied, 166 N.J. 606, 767 A.2d 484 (2000).
[9] Actions under Title III of the ADA relate to disability discrimination in public accommodations operated by private entities or individuals. Actions under Title II of the ADA relate to disability discrimination in public services, that is services offered by a public entity.
[10] Under Title III of the ADA, specifically 42 U.S.C.A. § 12188(a)(1), compensatory damages are not available to a private plaintiff. E.g., Ruffin v. Rockford Mem'l Hosp., 181 Fed. Appx. 582, 585 (7th Cir.2006) ("Money damages, however, are not available to private parties under Title III...."); Goodwin v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir.2006) (collecting cases from several courts of appeal, and holding that those "unbroken skein of cases makes manifest that money damages are not an option for private parties suing under Title III of the ADA").

In contrast, compensatory damages are available under Title II of the ADA, if a plaintiff shows discriminatory intent. 42 U.S.C.A. § 12133; see, e.g., Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir.2011) ("All circuits to decide the question have held that to recover compensatory damages under either the ADA or the Rehabilitation Act, a plaintiff must establish that the agency's discrimination was intentional.")
The LAD, of course, permits recovery of compensatory damages. N.J.S.A. 10:5-3, -13.
[11] As noted, the standards under the ADA are different depending on whether the facility pre-existed 1992 or was constructed or "altered" thereafter. The former need only meet the "program accessibility" (as opposed to the more stringent "facility accessibility") standard, which is intended to ensure broad access to public services while, at the same time, provide public entities with the flexibility to choose how to make access available. Chaffin v. Kansas State Fair Bd., 348 F.3d 850 (10th Cir.2003); Parker v. Universidad de Puerto Rico, 225 F.3d 1, 6 (1st Cir.2000).
[12] An award of attorneys' fees pursuant to a federal fee-shifting statute such as the ADA is required to comply with the guidance from the United States Supreme Court, which rejected the propriety of a contingency enhancement. See City of Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); see also Perdue v. Kenny A., 599 U.S. ____, 130 S.Ct. 1662, 1676, 176 L.Ed.2d 494, 509 (2010).