**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3465-16T1

MELISSA LEMA,

     Plaintiff-Appellant,

v.

BTS HOLDINGS, LLC,
and CRAIG LAX,

     Defendants-Respondents,

and

HAMID ABASSI,

     Defendant.

Argued September 20, 2018 – Decided  January 18, 2019

Before Judges Alvarez, Nugent, and Reisner.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7097-14.

Richard A. McOmber argued the cause for appellant (McOmber & McOmber, PC, attorneys; Richard A. McOmber, Christian V. McOmber, Matthew A. Luber,

Elizabeth A. Matecki, and Kaitlyn R. Grajek, of counsel and on the briefs).

Kenneth D. McPherson, Jr. and Jessica CM Almeida argued the cause for respondents (Waters, McPherson, McNeill, PC, attorneys; Kenneth D. McPherson, Jr., of counsel and on the brief; Jessica CM Almeida, on the brief).

PER CURIAM

After a four-day trial, a jury awarded plaintiff Melissa Lema $5000 payable by defendant BTS Holdings, LLC (BTS) on her retaliatory discharge Law Against Discrimination (LAD) complaint, as well as $2982.59 in lost wages. See N.J.S.A. 10:5-1 to -49. After Lema rested, the court dismissed the claims against the company's owner, Craig Lax, as well as the count seeking punitive damages. The trial judge thereafter allowed Lema's counsel $57,054 in fees and $5367 in costs. Counsel had sought $360,588 in fees and $8282.56 in costs. The court also denied Lema's two applications for recusal. We affirm.

We glean the facts from the trial testimony. Lema was hired in July 2014 by BTS's manager Younes Sabin[1] as a part-time night shift dispatch operator for BTS's livery service.

---

[1] The record spells Sabin's name in multiple ways. We hereafter adopt the spelling in defendant's brief.

The conduct at issue occurred when Lema interacted in September 2014 with an independent contract driver, Hamid Abassi. Abassi spent approximately two hours talking to her through the office transom window. Lema was working a day shift instead of her usual night shift and was on her lunch break. She and Abassi talked about a social media application (app) on her phone, which they both used, and Abassi attempted to contact her using the app. He then sent Lema two stock photos of women and a photo of himself, and also sent her heart emojis. There was conflicting testimony about Lema's social messaging skills, and the fact that she did not block Abassi on their mutual social media app. Lema said Abassi at some point afterwards entered the office, touched her shoulder, and stood behind her and whispered in her ear, "Oh, it's okay. I understand, it's all about life." Another dispatcher was present in the office that day, whom Lema claimed was in charge of the office. Lax testified the other dispatcher was neither a manager nor a supervisor.

On September 25, Abassi called the office during Lema's shift to tell her that he missed her. At that point, Lema spoke with Sabin about Abassi. She did not provide him with the videos that she alleged she had taken showing Abassi standing at the office window partition speaking to her. Nor did she show him Abassi's communications through the social app.

3

On September 26, 2014, Sabin texted Lema that she should not come into work. When she called, Sabin told her that she was not needed and was being fired for watching pornography while in the office.

Lema claimed that she sent Sabin copies of the four short videos and a screen shot from her social app depicting her communications with Abassi. She said that Sabin told her it was Lax's decision to terminate her. Sabin had left BTS's employ a year before trial and lived in Israel. Lema said Lax was in the office the day she complained to Sabin, however, he testified that during that week he was not in the office as it was a religious holiday. Abassi's contract with BTS ended shortly after Lema was terminated, as a result of a complaint from a woman passenger.

Lax denied being involved in the decision, claiming he was not even in the office when Sabin terminated Lema. The company continued to use only one operator per shift, as it had except for the short period when Lema worked for the company. Lema's complaint against defendants was filed October 2, 2014, literally days after her termination.

The videos Lema took of Abassi and the text messages were unavailable because Lema gave her phone to her brother. The parties agreed that any claim

A-3465-16T1

for lost wages would be limited to a ninety-day period. After Lema's termination, she obtained another job, within ninety days, at equal salary.

In discovery, Lema had provided the names of doctors and hospitals where she had been treated for injuries she alleged resulted from the incident with Abassi. No corroborating documentation was provided. During deposition, Lema said she was briefly hospitalized because of Abassi's conduct, however, that treatment turned out to have been for issues entirely unrelated to her employment at BTS.

The judge was aware of the fact the medical treatment was for a condition unrelated to the litigation. Prior to trial, the judge conducted a settlement conference in chambers. Shortly thereafter, counsel filed a motion for the judge to recuse herself, alleging she had made disparaging comments regarding Lema and otherwise was biased against Lema and her counsel.

The judge dismissed Lema's count against Lax because Lema's statement that Sabin told her Lax made the decision was simply not a sufficient basis to hold him in the case. Lax denied having even been aware of Lema's termination until after it happened. The judge concluded that no hearsay exception would make Lema's statement admissible substantive evidence that he participated in the decision.

Although not entirely clear, Lema argued that Lax was aware of the firing because Sabin had reported Lema as having watched pornography in the office, and that Lax directed Sabin to fire her for that reason. Other than a confused answer in deposition or answers to interrogatories regarding the point, there was no evidence of that occurring. The judge dismissed the punitive damage complaint because, as she put it, this was a "garden variety" case in which the offending conduct was minimal. She opined that something more than simply terminating Lema was required before defendant could be held accountable for punitive damages.

The judge decided the issue of counsel fees in a seventeen-page written decision. In that same decision, she also touched upon counsel's recusal motions, which had by then been made twice. The judge considered the recusal motions to be without foundation as they were based on statements she made taken out of context. Furthermore, the comments about the weaknesses in Lema's case took into account some of the real shortcomings in Lema's proof, such as her false assertion that she was treated for mental health problems as a result of the incident at BTS.

With regard to Lema's application for $360,600 in fees and for $8282.56 in costs, the court said generally that the application was excessive because

Lema's complaint was "relatively straightforward" and did not require, for example, the four lawyers who were present throughout the four-day trial. We need not repeat at length the judge's step-by-step consideration of the supporting documentation presented.

The judge did specifically reject the notion that the attorney's fee should be proportionate to the amount of damages the jury awarded but took into account Lema's degree of success. In her view, Lema had limited success and was not seeking injunctive relief or institutional improvement, but only money damages. The jury's verdict rejected the notion that Abassi's actions "actually caused her any distress." Lema limited her wage claim to a three-month period. The matter was neither difficult nor complicated, and the judge therefore reduced Lema's proposed lodestar of $240,392 to $135,843, adjusted by sixty percent to $54,337. She added a five percent contingency enhancement, appropriate in light of the nature of the case, bringing the total award to $57,054. Because she discounted some of the costs and expenses which she viewed as excessive, such as a copy charge of $1825, she reduced that amount to $5367.

Now on appeal, Lema, raises the following points:

> [POINT I].
> The Trial Court Erred When it Dismissed Plaintiff's
> Retaliation Claim Against Defendant Craig Lax

A-3465-16T1

[POINT II].
The Appellate Division Should Reinstate Plaintiff's Claim for Punitive Damages

    1.    The Trial Court Refused to Acknowledge Key Testimony that Went to the Heart of Plaintiff's Claim for Punitive Damages
    2.    The Retaliatory Conduct at Issue Here Was Engaged In by "Upper Management"
    3.    The Retaliatory Conduct Was Wantonly Reckless or Malicious

[POINT III].
The Trial Court Erred in Denying Plaintiff's Motion For Recusal of the Trial Judge, Who Subsequently Demonstrated a Clear Bias Against Plaintiff and her Counsel throughout the Trial

[POINT IV].
The Trial Court's Fee-Award Ruling is Erroneous.

    1.    Plaintiff's Fees and Costs Were Reasonable
    2.    After Slashing Plaintiff's Counsel's Lodestar Amount by $104,590, The Court Erroneously Issued Another 60% Downward Departure Due to Plaintiff's "Minimal Success" At Trial

I.

Lema hoped to impose liability on Lax through statements allegedly made by Sabin to her. Lax, called as a witness for Lema in her case in chief, testified to the contrary that he did not learn that Lema had been terminated until after it had occurred. He was equivocal about Sabin's reasons for the termination—but

testified unequivocally that because of Lyft and Uber, no second dispatcher replaced her. Lax also testified that Abassi was terminated after Lema sued. The judge found, and we agree, that this record simply does not support personal liability on the part of Lax. Lema also claimed that Lax and Sabin were upper management, the retaliatory action was engaged in by upper management, and therefore supported a claim for punitive damages. We do not agree.

In order to establish entitlement to an award of punitive damages under the LAD, a terminated employee must establish both actual participation in, or willful indifference to, wrongful conduct on the part of upper management and proof that the conduct is especially egregious. See Rendine v. Pantzer, 141 N.J. 292, 313-14 (1995). Lema simply failed to establish those two necessary elements. Even if Sabin was the general manager, and therefore within the definition of upper management, Abassi's conduct was simply not so egregious such that punitive damages are warranted. The behavior involved one episode, Abassi's few attempts at contact and an alleged unwanted touching on the shoulder. He was an independent contractor. This is not the type of egregious conduct that under Rendine establishes a basis for punitive damages. Ibid. This was not the type of retaliation that could be considered to be either wantonly

reckless or malicious.  <u>Id.</u> at 314 (citing <u>Nappe v. Anschelewitz, Barr, Ansell &</u>

<u>Bonello</u>, 97 N.J. 37, 49 (1984)).

II.

We consider Lema's arguments regarding the court's failure to recuse itself

to be so lacking in merit as to not warrant discussion in a written opinion.  <u>R.</u>

2:11-3(e)(1)(E).  By that decision we do not endorse the judge's demeanor

towards counsel, arguably less than ideal, albeit triggered by counsel's less than

ideal conduct during the course of the trial.  The judge exhaustively explained

her off-the-record comments, made in the hopes of reaching a settlement, as

triggered by the weaknesses in Lema's case, and she also indicated to defense

counsel the weaknesses in their case.  If anything, the judge was equally

impolitic to both attorneys.

III.

"Under the LAD and other state fee-shifting statutes, the first step in the

fee-setting process is to determine the 'lodestar': the number of hours

reasonably expended multiplied by a reasonable hourly rate."  <u>Rendine v.</u>

<u>Pantzer</u>, 141 N.J. 292, 334-35 (1995).

> In our view, the trial court's determination of the
> lodestar amount is the most significant element in the
> award of a reasonable fee because that function requires
> the trial court to evaluate carefully and critically the

aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application.

[Id. at 335.]

"Trial court[s] should not accept passively the submissions of counsel to support the lodestar amount":

> Compiling raw totals of hours spent, however, does not complete the inquiry. It does not follow that the amount of time actually expended is the amount of time reasonably expended. In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority. Thus, no compensation is due for nonproductive time. For example, where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time.
>
> [Ibid. (quoting Copeland v. Marshall, 641 F.2d 880, 891 (DC. Cir. 1980)).]

Furthermore, as Lema points out in her brief, "the Court may increase the fee 'to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome.'" (citing Rendine, 141 N.J. at 337). Also, to the extent that the trial judge suggested that failure to settle this litigation would be considered in assessing fees, we disapprove of that approach. "Bad faith and assertion of an

unreasonable position is properly considered in awarding a counsel fee, but failure to settle disputed claims is not in itself a permissible consideration in assessing a fee." Diehl v. Diehl, 389 NJ Super. 443, 455 (App. Div. 2006).

Lema argues that the "fees and costs were reasonable" and that "after slashing plaintiff's counsel's Lodestar amount by $104,590, the court erroneously issued another 60% downward departure due to plaintiff's 'minimal success' at trial." (alterations in original). In response, BTS argues that "[i]n reaching its decision on Plaintiff's application, the Trial Court followed Rule 4:42-9(b), outlining applications for attorney's fees." BTS also relied on Stoney v. Maple Shade Twp., 426 N.J. Super. 297 (App. Div. 2012), which states:

> If a court decides that the lodestar fee should be reduced, it may either "attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success". . . . "[T]he decision as to the method to be used rests in the equitable discretion of the court."
>
> [Id. at 319.]

It is inexplicable to us how the amounts requested were accumulated given the factual circumstances behind the claim. We see no reason why there should have been so many attorneys present in the courtroom during the course of the

trial.[2]  That seems to be entirely unnecessary duplication of effort in a fairly straightforward case.  Lema's counsel called two witnesses.  Defendants had offered Lema substantially more than she recovered by way of settlement.  The court took this appropriate consideration into account in making the allowance. See Best v. C&M Door Controls, Inc., 200 N.J. 348, 354 (2009) (holding that under certain fee-shifting statutes, "a trial judge may take into account a plaintiff's unreasonable rejection of an offer of judgment in calculating plaintiffs award[.]").  This issue does not warrant further discussion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2]  Counsel elected to divide the oral argument presentation on Lema's behalf between two attorneys.